**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**TINA MARIE GALLEGOS,**

           **Plaintiff,**

vs.                                                                                   **CIVIL No. 02-1270 RLP**

**JO ANNE B. BARNHART,
Commissioner of Social
Security Administration,**

           **Defendant.**

**MEMORANDUM OPINION AND ORDER**

Plaintiff filed an application for Supplemental Security Income benefits on October 4, 1999. Her application was denied at the first and second levels of administrative review. After a hearing, an administrative law judge (ALJ) concluded at step five of the five-part sequential evaluation process, *see* 20 C.F.R. 404.1520; Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir.1988), that Plaintiff could still perform limited light work and, therefore, was not disabled. (Tr. 15-24). Because the Appeals Council denied review, the ALJ's decision became the Commissioner's final decision. The matter now before the court is Plaintiff's Motion to Reverse Administrative Agency Decision and Remand for Rehearing. (Docket No. 12). For the reasons stated herein Plaintiff's Motion is denied.

**I.      Standard of Review**.

The Social Security Act provides that final decisions of the Commissioner shall be subject to judicial review. *42 U.S.C. §405(g)*. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . ." *Id.* I review the Commissioner's decision to determine only whether the decision is supported by substantial evidence and whether correct legal standards were applied. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994).

Substantial evidence is more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable man might accept to support the conclusion. *Gossett v. Bowen,* 862 F.2d 802, 804 (10th Cir. 1988). The determination of whether substantial evidence supports the Commissioner's decision is not a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes a mere conclusion. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). I will not reweigh the evidence, but will examine the record as a whole, including whatever in the record fairly detracts from the weight of the Commissioner's decision in order to determine if the decision is supported by substantial evidence. *Glenn*, 21 F.3d at 984.

## II.   Background

Plaintiff was fifty years old at the time of her administrative hearing. She has a 10th grade education and no relevant past work experience. Plaintiff alleges disability based on a combination of impairments, including seizure disorder, chronic back pain, knee pain and depression.[1] (Tr. 91, 111, 113, 232).

### A.   Seizure disorder.

Plaintiff was diagnosed with a seizure disorder in 1985, and used *Dilantin* and/or *Phenobarbital* for seizure control thereafter. (Tr. 164, 108, 134). None of Plaintiff's current physicians ever observed her having a seizure or in a post-ictal state. When Plaintiff was evaluated by her primary care physician, Dr. Gamez, on October 23, 1998, she did not mention seizures, nor did he list any medication that she was taking for seizure prevention. (Tr. 155). Dr. Gamez first noted a history of seizure disorder on September 30, 1999, but again, no current seizure medication

---

[1] Plaintiff also alleged vision problems and rectal bleeding. (Tr. 155, 117, 111, 145, 190). The medical record establishes that her vision is 20/20 with corrective lenses (Tr. 161) and that her rectal bleeding was caused by hemorrhoids. (Tr. 190, 215).

was listed and none was prescribed. (Tr. 137). Plaintiff was evaluated at the University of New Mexico Hospital ("UNMH" herein) on December 15, 1999, by Dr. Gregory Charleton and attending physician, Dr. Griggs-Damberger. (Tr. 164). Plaintiff stated that she had been off seizure medication for two months[2], was experiencing multiple seizures each week, and that previously seizures had been well controlled by medication, occurring once every two weeks. Her seizures were described as "weakness and tremulousness before sz --> then blackout. Witnesses describe shaking with occasional urinary incontinence, (+) post-ictal confusion." Dr. Griggs, diagnosed "GTC[3] epilepsy," noting Plaintiff's poor compliance with drug therapy. Plaintiff was given prescriptions for *Tegretol* and *Nortriptyline*, and told it was illegal for her to drive until she had been seizure free for one year. Id. Plaintiff testified that despite medication, she continued to have one to three blackouts caused by seizures on a weekly or monthly basis.[4] This was not reported to any of her treating physicians or counselors. (Tr. 189, 190, 211, 256, 215, 213, 255, 212, 254 232, 252, 251). Plaintiff also continued to drive. (Tr. 42, 232). Plaintiff was asked to return to UNMH six weeks later, presumably to determine whether she was taking an adequate dosage of *Tegretol*. (Tr. 164). There is no evidence that she did so. She was asked to keep a seizure journal. Id. There is no evidence that she did so.

      **B.**    **Back and Leg Pain.**

---

[2] Of note, on December 3, 1999, Plaintiff told her primary care physician that she had stopped taking anti-seizure medication one year earlier. (Tr. 134).

[3] Generalized tonic-clonic.

[4] Q: How often will you have a blackout?
 A: About at least once about maybe three times a week or sometimes a month, [INAUDIBLE]. (Tr. 47).

Objective medical evidence establishes that Plaintiff has pain producing impairments which can cause back and leg pain:

- June 22, 1998  X-ray evidence of degenerative changes in the cervical spine with disk space narrowing and spurring; and minimal joint narrowing of the knee. (Tr. 159).

- October 7, 1999  MRI of the lumbar spine shows small central disk protrusion at L5-S1, right predominate with minor thecal sac impingement and no obvious neuro-forminal impingement; very minimal disk bulge at L4-5 with no thecal sac impingement. (Tr. 136, 191).

- December 13, 1999  X-rays of bilateral knees showing very mild joint space narrowing medially consistent with osteoarthritis. (Tr. 133).

- August 23, 2000  Examination by a physical therapist documenting excessive tightness in hip musculature, compensated for by excessive movement in the lumbar spine, particularly focused around L3 and contributing to significant muscle spasm in the lumbar paraspinal muscles. Also documenting loss of conditioning and muscle strength in the legs due to knee pain. (Tr. 233).

The treatment records from Valencia Health Professionals, Dr. Gamez' group practice, seldom noted objective findings. When objective findings were charted, they were limited to findings of back tenderness (Tr. 155, 146, 137 190, 256, 255, 254, 252, 251), knee tenderness (Tr. 251) and on one occasion, decreased muscle strength in the lower extremities (Tr. 137) which resolved on later examination. (Tr. 190). On several occasions examination of Plaintiff's back and legs was charted as negative or within normal limits. (Tr. 143-145, 135, 189).

Dr. Castillo, a treating orthopedic surgeon, examined Plaintiff on January 19, 2000. He felt that the MRI of her lumbar spine was essentially normal and that surgical intervention was not indicated. He diagnosed chronic mechanical low back pain and told Plaintiff to engage in an active, conservative back program with lifestyle modification, a good exercise program and unspecified

4

symptom control. (Tr. 166). Dr. Gamez prescribed various pain medications for symptom control[5] and referred her to physical therapy. (Tr. 229-230). Physical therapist Philip Baca administered and documented numerous tests on August 23, 2000. Based on these tests, he felt that extensive tightness in her hip musculature caused her to develop excessive movement in her lumbar spine and muscle spasm in her back, and that knee pain had caused loss of strength and conditioning in her legs. He scheduled nine physical therapy sessions over a three week period starting in August 2000[6] to be followed by a home exercise program. (Tr. 232-233).

Dr. Anna Vigil, a neurologist, examined Plaintiff on October 4, 2000, after Plaintiff's administrative hearing. (Tr. 234-241). Dr. Vigil was provided a copy of the physical therapy evaluation referred to above. She took a detailed history in which Plaintiff listed her subjective complaints and medications. During her examination of Plaintiff, Dr. Vigil noted behavior which cast some doubt on the severity of Plaintiff's back and leg complaints.[7] The major positive findings on neurological examination were mild weakness on the left lower leg involving the hamstring and ankle dorsiflexors, difficulty balancing on either foot, difficulty standing up from a low lying stool suggesting proximal muscle weakness, and sensory loss in the left lower leg in a non-dermatomal

---

[5]See Tr. 128 for a list of Plaintiff's prescription medications, and the date each was first prescribed.

[6]Plaintiff's administrative hearing was conducted one week after her physical therapy evaluation. Records of additional therapy sessions were not provided to the ALJ prior to his decision or to the Appeals Council. A treatment note dated 9/27/00 from Dr. Gamez' office does not mention any physical therapy sessions (Tr. 251), and a subsequent note by a mental health counselor may indicate that Plaintiff never obtained the recommended therapy. (Tr. 260).

[7]"Features of the gait varied at different times. As I observed the pt ambulating into the examination room and out of the office at the end of the appt, her gait appeared more smooth and natural. As I tested her gait formally in the exam room the legs are held more stiffly and with more of a limping quality to the gait." Tr. 236.

pattern. She found no obvious deformity in Plaintiff's knees that would account for her pain complaints. (Tr. 235-236). Dr. Vigil indicated that based on her findings, Plaintiff may have some bending and lifting limitation due to low back pain and possible radiculopathy. Dr. Vigil deferred on the question of Plaintiff's standing and walking abilities, but stated that Plaintiff had no sitting limitations. (Tr. 236, 239). She also stated that because of her seizure history Plaintiff should not drive, operate dangerous machinery or be in dangerous situations in the work setting. Id.

### C.     Depression

Plaintiff's doctors noted her complaints of depression throughout the Fall of 1999. (Tr. 137, 135, 134). She was evaluated at Valencia Counseling Services, Inc., by Glenna Giles, a registered nurse and social worker (Tr. 180-184) and by Charlotte Glass, MA LPC [8]. (176-79). Plaintiff complained of grief over the death of her daughter some years before, sleep and appetite disturbance, irritability and decrease in memory, energy and motivation. (Tr. 180-184). On mental status exam, she was casually dressed, with a normal range of speech, tangential speech form, intact memory, appropriate thought content, depressed and anxious mood, cooperative attitude with fair insight, judgment and impulse control. (Tr. 182). Both Ms. Giles and Ms. Glass diagnosed Major Depression, Recurrent [DSM 296.33] and assigned a GAF of 50, indicative of serious symptoms or any serious impairment in social, occupational or school functioning. *Diagnostic and Statistical Manual of Mental Disorders*, 4th Ed. at. 32. Two antidepressant medications, *Celexa* and *Trazodone*, were prescribed and individual counseling was started. Two weeks later Plaintiff reported that she was sleeping better with no adverse medication side effects. Ms. Giles noted that the medications were starting to be effective in treating her depression.. (Tr. 168). At her second

---

[8]Ms. Giles' notes are not dated. Ms. Glass's notes are dated February17, 2000.

counseling session on March 22 Plaintiff reported poor sleep, feeling overwhelmed and fear of colon cancer. (Tr. 211). At her third counseling session on May 18, Plaintiff was again "quite depressed," complaining of poor sleep, arthritic pain and grief. (Tr. 215). On May 22, she was told to continue on her anti-depressant medication. (Tr. 213). On July 3 Plaintiff complained of chronic pain and fears for her grandchildren. (Tr. 212).

Plaintiff was evaluated by Rene Gonzalez, M.D., a psychiatrist, on October 18, 2000. (Tr. 242-244). Plaintiff told Dr. Gonzalez that she had incapacitating back and knee pain, that she had been depressed since the death of her daughter six years before, that she was taking an anti-depressant and undergoing individual therapy. She stated that her depression had worsened over the past two weeks. She complained of difficulty sleeping and stated that she was drinking to the point of intoxication on weekends and using marijuana. Dr. Gonzalez conducted a mental status exam which was unremarkable except for signs indicative of depression[9]. Plaintiff's memory, judgment and insight were not impaired. Dr. Gonzalez diagnosed Major Depression, recurrent, and alcohol and marijuana abuse and assigned a current GAF of 50 and prior year GAF of 70. In terms of her ability to perform work related functions, Dr. Gonzalez stated that Plaintiff had no limitation in the ability to understand and remember very short and simple instructions, that she had mild limitations in her ability to interact with the public, co-workers and supervisors, and no limitation in the ability to adapt to changes in workplace, be aware of normal hazards and react appropriately, use  use public transportation or travel to unfamiliar places. (Tr. 244).

---

[9]Decreased eye contact and psychomotor activity, sad and depressed mood, thought content showing some depressive trends, mildly impaired concentration and attention. (Tr. 243).

**III.   Issues on Appeal.**

Plaintiff raises the following issues:

A.   Whether the ALJ failed to apply correct legal principles in evaluating Plaintiff's claim at step three of the sequential evaluation process;

B.   Whether the ALJ failed to adequately develop the record when evaluating Plaintiff's residual functional capacity, and whether that evaluation was supported by substantial evidence that finding was supported by substantial evidence and the application of correct legal principles.

**IV.   Discussion.**

**A.   The ALJ applied correct legal principles in evaluating Plaintiff's claim at step three of the sequential evaluation process; substantial evidence supports the ALJ's step three findings.**

To qualify as disabled at step three of the sequential evaluation process, the claimant has the burden of demonstrating, through medical evidence, that her impairments "meet all of the specified medical criteria" contained in a particular listing. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). The ALJ determined that Plaintiff's impairment did not meet or equal a listed impairment, citing generally to Listing Sections 1.00 (Musculo-skeletal system), 11.00 (Neurological) and 12.00 (Mental disorders). (Tr. 15). Plaintiff contends that the ALJ erred by failing identify the specific listings he considered, citing to *Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir. 1996). The ALJ discussed the evidence in detail, stating why he did not find Plaintiff disabled. Although he did not place this discussion in the paragraph containing his step three finding, his evaluation as it pertains to step three is not so deficient as to be beyond meaningful review, the standard set by *Clifton.*

*1.   Musculo-skeletal impairment*

Plaintiff's back and leg complaints are analyzed under Listing §1.00. Listing §1.00 has seven

subparts[10], only two of which are arguably applicable to Plaintiff's claim: §1.02, Major dysfunction of a joint and § 1.04, Disorders of the spine.  Section 1.02 pertains to weight bearing joints and would apply to Plaintiff's complaints of disabling knee pain.  One of its required findings is gross anatomical deformity.  The ALJ noted Dr. Vigil's finding that Plaintiff had no obvious joint deformity in her knees. (Tr. 18).  Section 1.04 pertains to spinal disorders and would apply to Plaintiff's degenerative disc disease.  Required findings are:

> evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, §104(A).

The ALJ cited to Dr. Vigil's physical examination, which stated that Plaintiff's reflexes were 2+ and symmetrical and that she had no focal muscle atrophy (Tr. 18, 235).  In addition, the ALJ cited to the examination at NovaCare (Tr. 18), which documented a normal straight leg raising test.  (Tr. 233).

   *2. Neurological Impairment*

Plaintiff's seizure disorder is analyzed under 20 C.F.R. Pt. 404, Subpt P, App. 1, Listing §§11.02 and 11.03.  Listing §11.02 requires that seizures occur more than once a month in spite of at least three months of prescribed treatment. Listing §11.03 requires that seizures occur more than once a week in spite of  prescribed treatment.  Section 11.00(A) provides:

---

[10] 1.02 Major dysfunction of a joint(s) (due to any cause).
 1.03 Reconstructive surgery or surgical arthrodesis of a major weight bearing joint.
 1.04 Disorders of the spine.
 1.05 Amputation.
 1.06 Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones . . .
 1.07 Fracture of an upper extremity . . .
 1.08 Soft tissue injury . . .under continuing surgical management . . .

> Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed anti-epileptic treatment. Adherence to prescribed anti-epileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. . .

The ALJ noted that Plaintiff's seizures had been under good control prior to the time she stopped taking anti-epileptic medication, and that after medication was restarted in December 1999 Plaintiff did not report on-going seizure activity to Dr. Gamez or to her counselors. (Tr. 20). Substantial evidence supports the ALJ's findings that "in the absence of any further documentation [I am persuaded] that [Plaintiff's] seizure disorder is largely under control with medication." Accordingly, I find that Plaintiff did not establish the requisite severity (frequency) of seizures required for *per se* disability under the Listings.

   3.   *Mental Disorders.*

Plaintiff's mental disorder, depression, is analyzed under 20 C.F.R. C.F.R. Pt. 404, Subpt P, App. 1, Listing §12.04. In order to be of listing level severity, certain medical findings must be present:

-- Two of the following: (a) Marked restriction in activities of daily living, (b) marked difficulty in maintaining social functioning, (c) marked difficulty in maintaining concentration, persistence or pace, (c) repeated episodes of decompensation, each of extended duration;

   or

-- "Medically documented history of a chronic affective disorder of at least two years' duration". . . accompanied by either (a) repeated episodes of decompensation each of extended duration or (b) "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," or (c) "Current history of 1 or more years of inability to function outside a highly supportive living arrangement, with an

>indication of a continued need for such arrangement."

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04.

Plaintiff presented no evidence of episodes of extended periods of decompensation. By self report, Plaintiff has no difficulty getting along with family, friends, neighbors or people in authority, or going out in public. (Tr. 120-121). There is substantial evidence that her activities of daily living are not markedly restricted. As noted by the ALJ, Plaintiff lives with and is the primary care giver for three young grandchildren. She performs household chores, including cooking, cleaning, laundry and shopping. She drives, goes to movies and plays bingo twice a week. (Tr. 21, 104, 107, 119-120, 42-43). The ALJ cited to Dr. Gonzalez' findings, stating

>Dr. Gonzalez diagnosed a major depressive episode and alcohol/marijuana abuse and rated the claimant's current GAF at 50, although for the past year it was placed much higher at 70. In assessing her ability to do work related activity, Dr. Gonzales concluded that she had no limitations in the ability to understand and remember short and simple instructions, carry out instructions, relate to supervisors and adapt to change sin the workplace, such as avoidance of normal hazards. She has mild limitations in her ability to understand and remember detailed and complex instructions, maintain attention and concentration and interact with the public and co-workers.

(Tr. 19, 244).

Substantial evidence supports the ALJ's determination that Plaintiff did not establish the requisite severity required for Listing level depression.

**B.     The ALJ did not fail to adequately develop the record when evaluating Plaintiff's residual functional capacity. His evaluation was supported by substantial evidence and the application of correct legal principles.**

The ALJ found that Plaintiff retained the physical residual functional capacity for light work[11] provided she only occasionally climb stairs and ramps, balance, stoop, kneel and crawl, never climb ropes or scaffolds, and avoid exposure to hazards and cold temperatures. (Tr. 23). He further found that she retained the mental residual functional capacity for at least simple, unskilled, repetitive tasks. (Tr. 22). He then asked a vocational expert whether any jobs existed that would accommodate these limitation as well as her age, education and work experience. The Vocational expert identified three jobs which are available in adequate numbers in thee regional and national economies. (Tr. 60-61).

Citing to the Hearings, Appeals and Litigation Law Manual ("HALLEX[12]" herein), Plaintiff contends that the ALJ erred in evaluating her residual functional capacity because he did not provide a complete copy of the medical chart to the consulting medical advisors. Dr. Vigil reviewed the physical therapy evaluation performed by NovaCare (Tr. 234) which contained the most detailed musculo-skeletal evaluation of record as of that time. Dr. Gonzalez did not mention receiving any prior records. (Tr. 242-244).

The Tenth Circuit has not considered whether HALLEX procedures are binding on the Commissioner of Social Security. The Ninth Circuit has held that HALLEX does not have the force and effect of law and is not binding. *Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000). The

---

[11]Lift twenty pounds occasionally and ten pounds frequently, sit, stand and walk sex houes in a regular work day with occasional breaks. (Tr. 23).

[12]HALLEX contains the Social Security Administration's interpretation of the Social Security regulations. Sections I-2-5-20(A)(3) and I-2-5-22(2), when read in combination, state that the ALJ should provide the state agency procuring a consultative examination with a medical exhibits folder which contains the pertinent medical records.

Ninth Circuit looked to the "purpose" section of HALLEX, which indicates that the manual is strictly an internal guidance tool for the Office of Hearings and Appeals staff. Id. at 868-69. The Court also noted that HALLEX was not intended to be binding on the agency because it was not published in either the Federal Register or the Code of Federal Regulations and therefore was not promulgated in accordance with the procedural requirements imposed by Congress for the creation of binding regulations. Id. at 869. A more rigorous standard for the agency was imposed by the Fifth Circuit. In *Newton v. Apfel*, 209 F.3d 448, 459-60 (5th Cir.2000), the Court of Appeals held that although HALLEX does not carry the force of law, an agency must nevertheless follow its own procedures where the rights of individuals are affected, even where the internal procedures are more rigorous than otherwise would be required. Under the Fifth Circuit standard, a claimant must establish that she was prejudiced. Id. at 458.

Without adopting either standard, I find that Plaintiff has not established the prejudice required by the more rigorous standard. Both Dr. Vigil and Dr. Gonzalez took detailed histories from Plaintiff which reiterated much of the information that could have been gleaned from the records of her treating physicians and counselors. As noted by the ALJ, Dr. Gamez' records are brief in terms of objective findings. (Tr. 19). The letter prepared by Kazi Saleheen, M.D., stating his opinion as to Plaintiff's physical abilities was devoid of any objective findings that could be evaluated by another physician[13] (Tr. 231), and obviates any deference the ALJ would be required to give Dr. Salaheen's opinions under the treating physician rule. *Castellano v. Secretary of Health and Human Services,*

---

[13]Although signatures on the treatment record are nearly illegible, it appears that Dr. Salaheen's few treatment notes and the disabled parking certificate her prepared were provided to the Appeals Council, not to the ALJ. The only objective findings charted on his treatment notes are back and knee tenderness. (Tr. 251-256).

13

26 F.3d 1027, 1029 (10th Cir. 1994). Dr. Castillo's report indicated that Plaintiff's MRI studies were essentially normal and that she could and should be active. Plaintiff never returned to UNMH for further follow up of her seizure disorder. Dr. Gonzalez arrived at the same diagnosis as the counselors at Valencia Counseling Services, and the mental status examination performed by him did not reach markedly different conclusions than that performed by Ms. Giles. (Compare Tr. 243 with Tr. 182-183).

Plaintiff contends that the ALJ erred by failing to obtain a complete residual functional capacity assessment from Dr. Vigil, citing to 20 C.F.R. §416.919p, which provides that if the report of a consulting examiner is deemed inadequate or incomplete, the medical source completing the report will be contacted and asked to provide missing information or prepare a revised report.

In this case, Dr. Vigil's report did not omit addressing Plaintiff's capacity for bending, walking, standing and lifting. She declined to make this assessment, deferring to a formal functional capacities evaluation. (Tr. 236). The ALJ acknowledged these conclusions. (Tr. 18). Assessment of Plaintiff's functional limitation was otherwise available to and evaluated by the ALJ: The remainder of Dr. Vigil's findings, including discrepancies in Plaintiff's gait, *Id.*, see note 6, *supra;* pertinent MRI and radiological findings; the physical therapy evaluation; the lack of major abnormalities noted by Dr. Gamez[14]; Dr. Castillo's evaluation and recommendations, and the functional capacity evaluation performed by agency physicians. These records provide substantial evidence of Plaintiff's residual functional capacity for light work.[15]

---

[14]See p. 4, *supra*.

[15]Plaintiff contends that the agency physicians' evaluation concedes the medical evidence of record establishes that Plaintiff could not bend over well or walk very far (See Reply brief, Docket No. 17, p. 6, referring to Tr. 193), the full notation states goes on to state that "after she was prescribed mediation, her

14

Plaintiff argues that the ALJ's should have asked Dr. Gonzalez to reassess Plaintiff's functional limitations, describe the problems she would have with work stresses and explain her GAF ratings.  I find that Dr. Gonzalez' evaluation of Plaintiff's mental limitations, outlined  above, provides substantial evidence in support of the ALJ mental residual functional assessment.  Further, I find that Plaintiff's GAF ratings are consistent with the limitations found by Dr. Gonzalez and adopted by the ALJ.[16]

Finally, Plaintiff contends that the ALJ failed to consider the effect of medication on Plaintiff's residual functional capacity.  She argues that because the medications she take could cause drowsiness, and because she testified that she experienced drowsiness and sedation with medication, the ALJ was required to consider this limitation.  The ALJ acknowledge Plaintiff's testimony concerning medication induced drowsiness and sedation. (Tr. 16).  He also stated that Glenna Giles noted that Plaintiff had no adverse  reactions to antidepressant medication prescribed two weeks prior (Tr. 168, 18).  There is no evidence that Plaintiff ever complained of medication induced drowsiness or sedation to any treating or examining physician.  Accordingly, there is substantial evidence that Plaintiff did not suffer the adverse medication side affects that she claimed, and the ALJ was not required to consider those side affect in evaluating her residual functional capacity.

---

back pain decreased (and) 10/14/99 exam noted no numbness or weakness." (Tr. 193). Furthermore, the notation that Plaintiff could not bend over well or walk far is part of Plaintiff's subjective complaints, not part of the treating physicians  objective findings.  (Tr. 155).

[16]Consideration of the treatment notes and GAF evaluation from Valencia Counseling does not require a different result. Although documenting signs and symptoms of depression, situational difficulties and medical history,  the counselors from Valencia Counseling did not assign any functional limitations. Indeed when asked assess functional limitations in materials presented to the Appeals Council, Glenna Giles of Valencia Counseling stated that she had insufficient information to do so. (Tr. 259-260).

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse or Remand [Docket No. 12] is denied.

*[signature]*

**RICHARD L. PUGLISI**
**UNITED STATES MAGISTRATE JUDGE**
**(sitting by designation)**